| | | |
|---|---|---|
| 1 | 1 | UNITED STATES DISTRICT COURT |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

_____

DANIEL FAIN FOWLER,          )
                             )
          Plaintiff,         )
                             )
VS.                          ) Civ.Ac.No.:
                             ) 1:23-cv-01005-STA-jay
WOODRIDGE OF WEST            )
TENNESSEE, LLC d/b/a         )
PERIMETER BEHAVIORAL OF      )
JACKSON,                     )
                             )
          Defendant.         )

_____


                    DEPOSITION

                        OF

                 STARLETT ARMSTRONG

                  MARCH 5, 2024










            ALPHA REPORTING CORPORATION/VERITEXT
                   236 Adams Avenue
                  Memphis, TN 38103
                     901-523-8974

                                        Page 1

1           The deposition of STARLETT ARMSTRONG,

2     was taken on this, the 5th day of March, 2024, on

3     behalf of the Plaintiff, beginning at 9:35 a.m.,

4     pursuant to notice and agreement, at Spragins,

5     Barnett and Cobb, 312 East Lafayette, Jackson,

6     Tennessee.

7           This deposition is taken pursuant to

8     the terms and procedures of the Federal Rules of

9     Civil Procedure.

10          All forms and formalities, excluding

11    the signature of the witness, are waived, and

12    objections alone as to matters of competency,

13    irrelevancy, and immateriality of the testimony

14    are reserved, to be presented and disposed of at

15    or before the hearing.

16

17

18

19

20

21

22

23

24

Page 2

```
 1                  A P P E A R A N C E S
 2
 3
       FOR THE PLAINTIFF:        CHARLES H. BARNETT III,
 4                                ESQ.
                                 CHARLES H. BARNETT IV,
 5                                ESQ.
                                 312 East Lafayette
 6                               Jackson, TN  38101
 7
 8
 9
       FOR THE DEFENDANT:        JAY A. EBELHAR, ESQ.
10                               Jackson Lewis PC
                                 611 Commerce Street
11                               City Space Suite 2803
                                 Nashville, TN  37203
12
13
14
       ALSO PRESENT:            DANIEL F. FOWLER
15
16
17
       COURT REPORTER:
18
                       SANDRA J. VAUGHN, LCR
19                     Alpha Reporting Corp./Veritext
                        236 Adams Avenue
20                     Memphis, Tennessee 38103
                       (901) 523-8974
21
22
23
24
                                             Page  3
```

```
 1                    I N D E X

 2                                              Page

 3    Witness:

 4          Starlett Armstrong

 5    Examination by Mr. Barnett                   5

 6    Examination by Mr. Ebelhar                  55

 7    Further Examination by Mr. Barnett         62

 8

 9

10          EXHIBITS

11          Exhibit 1    Policy 5.4              50

12          Exhibit 2    King email              51

13          Exhibit 3    Emails                  54

14

15

16

17

18

19

20

21

22

23

24
```

Page 4

1    like a lot.

2          Q.    When you were interim CEO -- correct?

3          A.    Correct.

4          Q.    Did that put you over everybody?

5          A.    Yes.

6          Q.    You mentioned that you became COO?

7          A.    Interim, yes.

8          Q.    There was something else?

9          A.    COO.

10          Q.    What is that?

11          A.    Chief operating officer.

12          Q.    What is the difference?

13          A.    It's like one step below the CEO.

14          Q.    CEO is the right-hand person sort of?

15          A.    Yes.

16          Q.    In preparation for the deposition, did

17    you review any documents or emails or anything?

18          A.    No.

19          Q.    The people that you supervised like

20    Daniel Fowler, what did they do insofar as the

21    children are concerned?

22          A.    Individual therapy, group therapy,

23    activities, crisis management.  It's a lot.

24          Q.    A lot?

1    Q.    Did you have any -- did you make the

2    decision to terminate him?

3    A.    I did not.

4    Q.    Did you have any input on that decision?

5    A.    I did.

6    Q.    Tell us about what input you had on the

7    decision?

8    A.    So they asked me how do I feel about it,

9    and I said I was okay with it, because there were

10   so many pieces that just didn't fit with what we

11   were trying, I guess, to implement in terms of a

12   clinician.

13        There was a lot of avoidance in terms of

14   if I asked a question, there was a lot of

15   vagueness and avoidance.  I would say that to

16   Daniel, say, as your clinical director my job is

17   to teach you and help you, but if you don't

18   answer my questions or you're vague with me, I

19   can't do that.  Right?

20        He would say, you're right, I was vague.

21   Then he would eventually -- but I would ask a

22   question and it would take like thirty minutes

23   before I could get to an answer.

24        I even said to him at one point if I

1    can't trust you to answer me with a straight

2    answer, I can't trust that you are doing the same

3    thing with parents.  If they ask a question about

4    their kid, I don't know if you are giving them

5    accurate answers or if you are like answering

6    their question with a question.

7         Like I have -- because clinicians work

8    independently.  They have a master's degree in

9    counseling or a master's degree in social work or

10   in psychology.

11        They work independently with these

12   children and families, and I needed to be able to

13   trust that you are giving parents what they

14   expected.  If that makes sense?

15        Q.   I want to make sure that I get every --

16   if I ask you something multiple times and ask if

17   that is all, I'm trying to make sure I have

18   gotten everything.

19        In addition to that, was there any other

20   reasons that you thought he might not be a good

21   fit?

22        A.   You probably already know this.  Like

23   other departments were saying he was coming to

24   their departments and telling them things they

1    were doing wrong.

2         So he would go to the education

3    department and say, you guys are doing like --

4    it's been over two years, I guess you are not

5    going to quote me.  But don't quote me.

6         Q.   Ultimate quoting?

7         A.   Yeah.  So these are just examples.  I'm

8    not saying these specific things happened, but

9    somewhere in this realm.

10        He would go to the education department

11   and say, I looked at your records and I don't

12   think you are doing IEPs right.  Could have been

13   something else, I'm just saying.

14        So then the nurses would come to me and

15   say will you have a conversation with him because

16   he has come in the nursing office and told us our

17   documents are wrong and we don't have to wear

18   masks, it was the height of COVID, and masks are

19   blah, blah.

20        And the A&R department would come and

21   say, Daniel was down here last night and he said

22   our documents are wrong and we're doing this

23   wrong and doing this wrong.

24        Pretty much every department was like

1    can you have a conversation with Daniel and ask

2    him not to do these things.

3              So that to me sounded like it was making

4    the work environment -- people were just becoming

5    frustrated, because they were like he should be

6    in the clinical department, why is he in A&R, the

7    education department, why is he in the nursing

8    office, why is he telling case managers they are

9    doing it wrong?

10             Every department was hearing you are

11   doing it wrong, you're doing it wrong.

12        Q.    Okay, I understand what you are saying.

13   He was frequently pointing out what he thought

14   was wrong, correct -- right?

15        A.    Yeah.

16        Q.    And many of those things based on what

17   you told me he was saying are violations of the

18   law, like not complying with IEP, this was

19   illegal, this, that, and the other?

20        A.    I don't work in the education

21   department, I don't know --

22        Q.    I'm not saying he is right.

23        A.    I don't know if he said it's a violation

24   of the law.  I don't know doing it wrong is a

1    another child said DS said that Daniel had asked

2    her to lift up her blouse or shirt.

3              Am I correct about that?

4        A.    Yes.

5        Q.    Tell me about that?

6        A.    We were in treatment team, and so

7    treatment team consists of myself, the clinical

8    director, the therapist, the activities

9    coordinator I was telling you about, someone from

10   the education department, someone from the tech

11   unit, nurses, so treatment team for the children.

12             Children come in.  We go over progress,

13   lack of progress, issues, things like that.

14             We were in treatment team and we had

15   that child's worker on video conference, because

16   if they are out of the state they could zoom in

17   to the treatment team.  So either it be

18   telephone, video conference, they can be a part

19   of their --

20       Q.    I got lost in my own thought for a

21   second.  Who is zooming in from out of state?

22       A.    The child that was in treatment team,

23   her DCS worker was zooming in.

24       Q.    Would that be a Tennessee DCS worker?

1        A.    No, Texas.  I can't remember if she was

2    Texas or Wisconsin.  She was out of state, I will

3    say that, might have been Wisconsin.

4            So this was her first treatment team,

5    and her worker was asking all the questions like

6    how are you doing, are you okay with your

7    roommate, what are you learning, all the things.

8            So she said, oh, I became friends with a

9    girl named DS -- I'm not quoting it.

10        Q.    Summarizing?

11        A.    Thank you.  Something to the effect I

12    became friends with a girl named DS.  I think she

13    said something like she has the same therapist I

14    have.  She said, I am a little weirded out

15    because she said he asked her to lift her shirt

16    up.

17            Everybody in treatment team stopped

18    breathing.  Her worker is on the phone.  She is

19    like, what?  In my head I am like, here we go.

20    That is how we learned about it in treatment team

21    in front of everybody.

22        Q.    So when that occurred, what did you do?

23        A.    I contacted my supervisor, and I believe

24    at the time we were still struggling with CEO, so

1    I think I contacted Robert.  He was the regional

2    CEO who had been helping out at our regional

3    location Perimeter.

4         I told him what happened, told him that

5    is an allegation.  Whenever there is an

6    allegation, I am a mandated reporter.  I told him

7    this just happened, I'm going to be calling in a

8    CPS report.  He said, you need to put him on

9    administrative leave immediately.  I said okay.

10        So we called in a CPS referral.  I

11   called Daniel in and told him -- I'm not sure if

12   I called him in before or after I called CPS.  I

13   either said I'm going to call CPS just to FYI, or

14   I have called CPS FYI.  I don't do shock and awe.

15        I called him in, told him about the

16   allegation, told him he needed to be placed on

17   administrative leave until it was resolved.

18        Q.   Daniel says that when he was called in

19   to talk to you that you said words to the effect

20   in substance, not quoting like you --

21        A.   Summarizing.

22        Q.   Yeah -- in substance that you told him

23   that you had talked to the child and determined

24   that there was no basis for the complaint and

1    that he would probably be off only a day or two.

2            Do you recollect that?

3        A.    No.

4        Q.    Did you talk to the child?

5        A.    I'm sure I did, because before you call

6    CPS you have to talk to the child.  CPS came to

7    Perimeter and did a training on therapists on

8    when and why we need to call in allegations.

9    They told us before you call us in, make sure you

10   get the who, what, when, where, how.

11           So if I call and say this kid said there

12   is an allegation, and if they start asking

13   questions and I don't have answers, they don't

14   know how to rate the allegation.  Is it urgent,

15   emergent, they don't know how to rate it because

16   they don't have enough information.

17           So I am sure I talked to the kid prior

18   to calling CPS, because that is what we're

19   supposed to do.

20       Q.    Again, Daniel says that the written

21   protocol of Perimeter was not followed.  And I

22   have looked at that protocol, and it says that

23   the person that was to conduct the investigation

24   or whatever was basically HR.

1            MR. BARNETT:  Can you find that for me?

2      It uses another word than HR, it uses child

3      something.  I am informed that is HR, and it

4      seems to say that reporting it is a judgment call

5      if you decide that there is some basis for it.

6            THE WITNESS:  No, no.  No, no.

7            MR. EBELHAR:  I object to the form of

8      the question.  When I make the objection, you go

9      ahead and answer the question.

10            THE WITNESS:  No, no.  I don't determine

11      whether there is a basis or non-basis.  Per the

12      Department of Children's Services, and I have

13      worked there for years, I don't need to believe

14      the allegation.  I don't need to know it is true.

15            Anybody in a vulnerable population, if a

16      child comes to me and says a therapist asked me

17      to lift my shirt up, that is an allegation.

18      Whether I think it's true, know it's true, know

19      it's a lie, has no basis on whether I call that

20      in or not.

21            Mandated reporting says all allegations

22      have to be called in to CPS, because I don't

23      investigate them.  So I ask the pertinent

24      questions, who, what, when, where, how.  I call

1    CPS and say this was an allegation made by

2    blah-blah-blah.  This is the who, what, when,

3    where, how.

4         Then they investigate.  I don't

5    investigate.  Perimeter does not investigate.

6    CPS investigates.

7         Q.   (BY MR. BARNETT) So are you saying that

8    you would not have conducted an investigation

9    other than getting the what, when, and how?

10        A.   Absolutely.  Not an investigation.

11        Q.   Take a look if you will -- take a look

12   at the procedure that I am informed is down at

13   the bottom.  Will you read that out loud and

14   explain that to me?

15        MR. EBELHAR:  Do you have a copy I can

16   look at?

17        MR. BARNETT:  I can make one.  The

18   printer is there.  It will be like two seconds.

19        (Whereupon, a recess was taken.)

20        MR. BARNETT:  For the record, we're

21   looking at a document, at the top it's labeled

22   HIPAA Privacy Rule Policies and Procedures,

23   Policy Number 5.4.

24        That is what you are looking at, isn't

Page 31

1    it?

2                    THE WITNESS:  Yes.

3         Q.    (BY MR. BARNETT) We're going to Roman

4    numeral II, Procedure.  Take me through how this

5    would apply to this situation.

6         A.    Where do you want me to start?

7         Q.    Start with one under Procedure.

8         A.    If an employee of Woodridge reasonably

9    believes that a patient of Woodridge is a victim

10   of abuse, neglect, or domestic violence --

11        Q.    Let me stop you there.  Doesn't that

12   require that the belief be reasonable?

13        A.    So if it's reported, that is reason

14   enough.

15        Q.    Okay.  Go ahead.

16        A.    An employee informs the privacy officer

17   on his or her behalf.

18        Q.    Who is the privacy officer?

19        A.    At that point, I don't think we had one.

20        Q.    Would it have been a lady by the name of

21   Lentz (phonetic)?

22        A.    Stephanie Lentz, I forget what her title

23   was.  Whenever there was anything reported, we

24   definitely reported it to her for record-keeping

                                        Page 32

1    purposes.  But she was not the person who called

2    in CPS investigations.

3              Because, again, all clinicians are

4    mandated reporters.  So above and beyond

5    anybody's policy, in terms of my license, I am a

6    mandated reporter.

7              So what we did at Perimeter is the

8    person who received the allegation reported the

9    allegation, and then reported it to this person,

10   so you probably have an email from me that says

11   CPS was reported, here is the report number, here

12   is the allegation.

13       Q.   So did you ever have a, quote, privacy

14   officer there?

15       A.   I don't know that she was called the

16   privacy officer.

17       Q.   Was there a time when someone else was

18   called the privacy officer?

19       A.   I think she was called like patient

20   advocate.  Don't quote me.  I don't remember.

21       Q.   But you are saying --

22       A.   I don't think she was called the privacy

23   officer.

24       Q.   But it was somebody other than HR?

1      this is to the best of my recollection.

2              We reported it to CPS.  Again, Robert --

3      can't think of his last name -- informed me that

4      Daniel needed to be placed on administrative

5      leave, which he was.

6              We got, I would say, feedback from

7      Texas.  I am saying feedback because I don't

8      remember if it was a phone call or email.  But we

9      got feedback from Texas inquiring as to why the

10     CPS report wasn't made to Texas since DS was a

11     Texas resident.

12             They were a little upset with us for

13     reporting it to Tennessee and not Texas.  At that

14     point they told me that whenever an incident

15     happens with a Texas kid it has to be reported to

16     the Texas hot line as well.  So I made the report

17     also to the Texas hot line.

18        Q.   Okay.  Again, Daniel tells me a couple

19     of things there.  That is, after it was reported

20     to the Tennessee CPS that they shortly thereafter

21     determined that there was no basis to proceed

22     with the complaint, that it wasn't actionable,

23     valid.  Is that true?

24        A.   From what I remember, it wasn't that

1   there was an incident?

2        A.   She did say she said it.  She did say

3   she told the girl that he asked her to lift her

4   shirt.  If she told me it was accurate or not, I

5   don't remember.

6             I'm sure I would have taken notes, but I

7   don't have access to those right now because I

8   don't work for Perimeter.  I am sure I would

9   have, because when I talk to kids I take notes.

10            I don't remember if she said, yeah, I

11  told her that because it was true, or I told her

12  that but it was a lie.  I don't remember.

13       Q.   Okay.  Your notes, would they normally

14  be stored at Perimeter at some place?

15       A.   Normally I take notes on a legal pad.

16  When I'm getting the who, what, when, where, why,

17  I have to call it in, I need notes to anwer

18  questions.

19       Q.   You do have paper files for each child?

20       A.   Yeah, but it would have been in the CPS

21  report.  So whatever is in the CPS report would

22  have been pretty much it.

23       Q.   Okay.  As I understand your testimony,

24  if it was reported a second time to CPS by you,

1    and says I saw you Friday, then I saw you Friday.

2    That was a lesson I had to learn.  A kid would

3    say I haven't been seen in three weeks.  I said

4    have them sign in, it will protect you.

5            For the week, the sign-in sheet would

6    have maybe three or four kids have signed in.  I

7    can't say that means the kid hasn't been seen,

8    but you can't verify the kid hasn't been seen.

9            Kids were saying I haven't seen

10   Mr. Daniel in two or three weeks, he only sees me

11   for my family sessions, I don't get individual

12   sessions, and stuff like that.

13           Q.   Were kids telling you that?

14           A.   Kids were telling me that, yeah.

15           Q.   Was that something that factored into

16   your recommendation to Mr. Sizemore?

17           A.   Yes.

18           Q.   When you spoke to Mr. Sizemore, did you

19   have a sense on where he was, what he was

20   thinking on his decision?

21           A.   It sounded like he was already -- he had

22   already decided that Daniel wasn't a good fit.

23   Again, based on all the information he had gotten

24   not only from me but other departments and other

```
 1    clinicians, it sounds like he had already come to

 2    the conclusion that he wasn't a good fit.

 3            But he certainly didn't want to make

 4    that decision without speaking to me.

 5        Q.   You may or may not be aware, I will

 6    represent to you there is an allegation in this

 7    case that Mr. Fowler reported violations of law

 8    that Perimeter and its staff were -- violations

 9    that they had engaged in that he made reports to

10    the TBI and another Tennessee state agency.

11            Do you have any knowledge of any report

12    of legal violations to any Tennessee agency?

13        A.   No.  TBI, like the FBI but Tennessee's

14    version?

15        Q.   Tennessee Bureau of Investigation?

16        A.   No.

17        Q.   No, you are not aware of anything like

18    that?

19        A.   No.

20        Q.   At any point did Mr. Fowler go to you to

21    say he was concerned that Perimeter was

22    fraudulently billing federal or state

23    governments?

24        A.   Yeah.
```

Page 60

```
1                    C E R T I F I C A T E
2
     STATE OF TENNESSEE
3
     COUNTY OF SHELBY
4
5             I, Sandra J. Vaughn, LCR #512,
     Licensed Court Reporter and Notary Public,
6    in and for the State of Tennessee, do
     hereby certify that the above proceeding
7    was reported by me, and the transcript is
     a true and accurate record to the best of
8    my knowledge, skills, and ability.
9             I further certify that I am not
     related to nor an employee of counsel or
10   any of the parties to the action, nor am I
     in any way financially interested in the
11   outcome of this case.
12            I further certify that I am duly
     licensed by the Tennessee Board of Court
13   Reporting as a Licensed Court Reporter as
     evidenced by the LCR number and expiration
14   date following my name below.
15            I further certify that this
     transcript is the work product of this
16   court reporting agency and any
     unauthorized reproduction and/or transfer
17   of it will be in violation of Tennessee
     Code Annotated 39-14-104, Theft of
18   Services.
19
20            SANDRA J. VAUGHN, LCR #512
              Expiration Date 06-30-2024
21            ALPHA REPORTING CORPORATION
              A Veritext Company
22            236 Adams Avenue
              Memphis, Tennessee 38103
23
     My commission expires:
24        April 6, 2024

                                        Page 66
```

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.