1  _____

2          IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF TENNESSEE
3                 EASTERN DIVISION

4  _____

DANIEL FAIN FOWLER,              )
5                                 )
            Plaintiff,            )
6                                 )
vs.                              )  Civil Action No.:
7                                 )  1:23-cv-01005-STA-jay
WOODRIDGE OF WEST TENNESSEE,)
8  LLC d/b/a PERIMETER            )
BEHAVIORAL OF JACKSON,           )
9                                 )
            Defendant.            )
10 _____

11

12      **THE DEPOSITION OF MR. DANIEL FAIN FOWLER**

13              February 28, 2024

14

15          **A P P E A R A N C E S**

16  For the Plaintiff:        MR. JAY A. EBELHAR
                              Jackson Lewis
17                            Suite 2803
                              611 Commerce Street
18                            Nashville, Tennessee 37203

19  For the Defendant:        MR. CHARLES H. BARNETT III
                              MR. CHARLES H. BARNETT III
20                            Spragins, Barnett & Cobb
                              312 East Lafayette
21                            Jackson, Tennessee 38301

22

23          SCHAFFER REPORTING SERVICE
              JILL A. SCHAFFER, RPR
24              P.O. Box 3214
            Jackson, Tennessee 38303
25              (731)668-6880

1          The deposition of **MR. DANIEL FAIN FOWLER**

2     was taken at the instance of the Defendant, pursuant to

3     notice, on the 28th day of February, 2024, beginning at

4     approximately 10:01 a.m. and ending at approximately

5     5:35 p.m., at the law offices of Spragins, Barnett &

6     Cobb, Jackson, Tennessee, for use pursuant to the

7     Tennessee Rules of Civil Procedure before Jill A.

8     Schaffer, Registered Professional Reporter, Licensed

9     Court Reporter, and Notary Public for the State of

10    Tennessee.

11          Counsel stipulated that all objections,

12    except as to the form of the questions, were reserved

13    to on or before the hearing and that all forms and

14    formalities, including the reading and signing of the

15    completed deposition by the witness, were expressly

16    waived.

17                         - - - - -

18

19                    **I N D E X**

20    Examination by Mr. Ebelhar                  Page    4
      Examination by Mr. Barnett IV                     225
21    Further Examination by Mr. Ebelhar                232
      Further Examination by Mr. Barnett IV             237
22
      Reporter's Certificate                            240
23

24                         - - - - -

25

1                           **E X H I B I T S**

2        Exhibit 1                                        Page    54
         Exhibit 2                                                69
3        Exhibit 3                                                75
         Exhibit 4                                               105
4        Exhibit 5                                               105
         Exhibit 6                                               105
5        Exhibit 7                                               110
         Exhibit 8                                               112
6        Exhibit 9                                               147
         Exhibit 10                                              147
7        Exhibit 11                                              224

8
                              - - - - -
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **MR. DANIEL FAIN FOWLER**,

2    having been duly sworn, was examined and testified as

3    follows:

4        **EXAMINATION BY MR. EBELHAR**

5    Q    Okay.  My name is Jay Ebelhar.  As I think you

6    know, I represent the defendant in the lawsuit that you

7    filed against it, Woodridge -- Woodridge Healthcare, I

8    think, commonly known as Perimeter Healthcare.

9    A    (The witness nodded.)

10   Q    Is that correct?

11   A    Yes.

12   Q    And I think just for consistency, we'll just refer

13   to it as my client is Perimeter throughout this

14   deposition.  Is that okay?

15   A    Yes, sir.

16   Q    Okay.  And I know we met very briefly a moment

17   ago, but if you don't mind please stating your name for

18   the record.

19   A    Daniel Fowler.

20   Q    Okay.  And, Mr. Fowler, is there anything going on

21   today that might interfere with your ability to testify

22   truthfully and honestly?

23   A    No, sir.

24   Q    Are -- any medical conditions that might impact

25   your -- your memory, your ability to recall facts and

1          And so I sent that to -- and then finally Greg

2     responded back and said, You're right.  It was me who

3     said you couldn't come back and work on any of the

4     units.

5     Q     Oh, okay.

6     A     So Greg decided that.  Greg made that decision.

7     To me, that -- that's harassing in itself because it's

8     not according to what is -- normally happens or what's

9     normally done.

10         It was Greg that decided that himself on his own

11    to leave me out and to leave me hanging for all of

12    these months and blame it on DCS.  He blamed it on DCS.

13    Then when he was caught by Nathan and -- he finally had

14    to come to realization and stop lying and finally say,

15    Yeah, it was me.

16    Q     Back it to my other question, is there anything

17    else other than what's in these emails that you would

18    consider harassing from Greg Sizemore?

19    A     Not that I can think of.

20    Q     Okay.  Do you have any knowledge as far as whether

21    Greg Sizemore knew that you were reporting violations

22    of HIPAA or of ethics or otherwise?

23    A     Yes.  I told him directly that there was more than

24    seven -- 6,000 emails being deleted from my computer

25    and that I could witness them being deleted.  I also

94

1    told him in --

2    Q    Okay.  Hold on a second.  So let's --

3              MR. BARNETT IV:  Well, let him -- let

4    him finish his answer.

5              MR. EBELHAR:  That's fair.  That's fair.

6    A    I also told him in email that when Keith and Chuck

7    came to my house and delivered those boxes they

8    delivered a hard drive and a jump drive to my house

9    that belonged to Perimeter that had -- and so they

10   delivered both of those to my house.

11   Q    (By Mr. Ebelhar)  Okay.  Anything else?

12   A    I told him that it was retaliation, just like I

13   told Mackenzie, and I told him what it was for.  I told

14   him that numerous times.

15   Q    Okay.  So let's talk about the deleted files

16   first.  And this was in the context of me asking you

17   whether you had told Greg that you'd reported HIPAA

18   violations and other -- of other laws.

19   A    (The witness nodded.)

20   Q    So on deleted files, when did you tell Greg

21   Sizemore about the deleted files?

22   A    I have to look through the emails.

23   Q    Okay.

24   A    There's another set besides these.  There's a

25   fourth set.

1    Q    There are?

2    A    Um-hum.

3    Q    And what's -- I don't know that I've seen that

4    email -- but if you can recall, what that email is

5    about?

6    A    I saw it in your -- your documents you sent over

7    to --

8    Q    Oh, did you?  What's -- what do you recall the

9    email saying?

10   A    So it started out with me saying -- telling Greg

11   thank you for visit -- letting me come in and talk to

12   him today and -- and letting me do the appeal and doing

13   the appeal process.

14        And then I let him know about the over 6,000

15   emails that were being deleted and how could that be

16   happening if it -- it was a long Word document.

17   Q    Um-hum.

18   A    And so how could that be happening if my office

19   was supposed to be closed for an investigation?  Does

20   that sound familiar?

21   Q    (Mr. Ebelhar nodded.)

22        It does.

23   A    Good.  And then so it was that -- that email that

24   was in part of the appeal process.  So that happened,

25   that one.

1          Then there was also a -- an email from -- from

2     June 5th that I sent to him after they had dropped off

3     all of the stuff to my house that I let him know that I

4     could see all of the items that were being deleted off

5     of the account from my phone still because it was

6     connected to the OneDrive, so I could see everything

7     that was still being deleted, everything as it was

8     being deleted off.

9          And I also let him know that they had given me

10    that hard drive from Perimeter and that they had given

11    me a jump drive that had Dr. William Beyers' documents

12    and everything on it.

13    Q    Okay.  And that was in a June 5th email?

14    A    June 5th.

15    Q    Okay.

16    A    And I have -- I have supplied them with all the

17    documents that were on the hard drive and with

18    Dr. William Beyers' documents.

19    Q    Okay.  Let me -- wait.  Did you say Dr. William

20    Beyers?

21    A    Yes, sir.

22    Q    Okay.

23    A    There were -- there were psychosocial and

24    psychosexuals and all kinds of other documents.

25    Q    Let me pass you what we'll mark as Exhibit 5.

1    A    Yes, sir.

2    Q    Okay.

3              THE REPORTER:  Let me catch up marking

4    the exhibits.

5              (Exhibits 4 and 5 were marked.)

6              MR. EBELHAR:  So this will be 6?

7              THE REPORTER:  Correct.

8              MR. EBELHAR:  6.

9              (Exhibit 6 was marked.)

10   Q    (By Mr. Ebelhar)  Okay.  So I'll pass you what

11   we're marking as Exhibit 6.  And do you recognize this

12   document?

13   A    This is -- this is the appeal.

14   Q    And so this is an appeal of what?

15   A    The separation.

16   Q    Okay.  So you appeal being separated.  The first

17   page says "April 4, 2022."  Does that date seem right

18   to you?

19        The reason I ask is on the second page, Daniel

20   Fowler Appeal, you write "On April 20th, 2022, I

21   received a FedEx delivery of a separation notice."  And

22   then on the very last page, you sign it and it's dated

23   April 20th, 2022, at 7:02 p.m.

24   A    More than likely, I put April 4th is the day

25   when...

```
 1    Q    So do you think you sent this to Mr. Sizemore --

 2    A    April 20th.

 3    Q    April -- okay.

 4         So turning back to -- the only other question I

 5    have about this document is turning back to the very --

 6    the second page -- the first page of full text.  You

 7    write "On April 20, 2022, I received a FedEx delivery

 8    of a separation notice from Perimeter Healthcare of

 9    Jackson, Tennessee."  Is that right?

10    A    (The witness nodded.)

11         Um-hum.

12    Q    Okay.

13    A    Yes, sir.

14    Q    Is that what you recall happening?

15    A    Yes, sir.

16    Q    Okay.  Because earlier you testified you weren't

17    separated or terminated until June, and you were strown

18    along.

19    A    Well, that's because when I did this appeal --

20    there's even an email where Greg says to stay on leave

21    until he tells me further.

22    Q    Now -- no.  I'm pretty sure I haven't seen that

23    email.  Do you have a copy of that?

24    A    Yes, sir.

25              MR. BARNETT IV:  Yeah.  I'm -- I don't
```

```
 1    know where it is, but yeah.

 2                    MR. EBELHAR:  Okay.

 3    Q    (By Mr. Ebelhar)  And do you recall the date of

 4    that email?

 5    A    Right after I sent this.

 6    Q    Okay.

 7    A    Stay on leave until the -- until the investigation

 8    is over.

 9                    THE WITNESS:  Look -- look at the list

10    of things.

11    A    It's in yours too because you sent the document to

12    me -- to us.

13                    THE WITNESS:  Can I see that itemized

14    list?

15                    MR. BARNETT IV:  I don't have a list.

16                    THE WITNESS:  The one --

17                    MR. BARNETT IV:  Oh, yours.  I don't

18    know where that is.

19                    THE WITNESS:  I have no idea.

20    Q    (By Mr. Ebelhar)  Well, and we can check on that

21    in a little bit.  But let me ask...

22    A    Um-hum.

23    Q    He said stay on leave.  When -- when is it that

24    you are testifying you were finally cut loose from the

25    company?
```

```
 1    A    In June.

 2    Q    In June?  Okay.

 3         Okay.  Okay.  So just to kind of bring us back to

 4    center here, you first told Greg Sizemore about the

 5    deletions when you sent the appeal.  Is that right?

 6    A    Yes.

 7    Q    Is that right?

 8    A    Yes, sir.

 9    Q    Okay.  And let's see here.  This is back on the

10    topic of telling Greg about HIPAA violations.  You had

11    mentioned something about the delivery of items at your

12    house?

13    A    Yes, sir.  I got a external hard drive and a jump

14    drive.

15    Q    Okay.  And when did you get those -- those items?

16    A    When Keith brought items to my house.

17    Q    Okay.  And that would have been in June?

18    A    No.  That was earlier than June.  Well, no.  It

19    was June.  It was June because I sent the follow-up

20    email with -- with what he had sent me on June 5th.

21    Q    Okay.  Okay.  Any other time that you put either

22    Greg Sizemore on notice that you had been reporting

23    HIPAA violations or reporting HIPAA violations to him?

24    A    Just in, like, the appeals or like that, when he

25    sent -- they sent me the hard drive and the external
```

1    hard drive.  Primarily just in emails.

2    Q    Okay.  And then bringing us back to the original

3    topic that got us started on this, this was all

4    about -- or the main topic we were talking about were

5    examples of when you were harassed.

6         Other than -- well, first of all, is there

7    anything else from Greg Sizemore that constituted

8    harassment?

9    A    Not that I can think of.

10   Q    Okay.  Anything from anybody else that constitutes

11   harassment?

12   A    Not that I can think of at the moment.

13   Q    Okay.

14                   MR. BARNETT IV:  Are you down for --

15                   MR. EBELHAR:  I'll just ask one more

16   question on this topic and stop and get lunch.

17                   MR. BARNETT IV:  Okay.

18                   MR. EBELHAR:  Yeah.  We're on the same

19   wavelength.

20                   MR. BARNETT IV:  Because I just didn't

21   want you to start on something --

22                   MR. EBELHAR:  I understand.  And I

23   agree.

24   Q    (By Mr. Ebelhar)  I'm going to pass what we're

25   going to mark as 7.

```
 1              I was trying to explain so much all at once all at

 2      the same time.  And at -- at the same time I was

 3      frustrated but kind of scared, frustrated, didn't know

 4      which way to go, didn't know what was going on.

 5              And so I kind of helped -- hoped that he would

 6      give me some insight and light.  And so he just told

 7      me, Look, you've got an appeal process you can go

 8      through.  Do the appeal.  I'll look at the appeal, and

 9      I'll give you a call.  He never gave me a call, though.

10      Q    Was anybody else present at that meeting?

11      A    Not to start with, but at the end Mackenzie came

12      in.

13      Q    Is this Mackenzie Rowan?

14      A    Yes, sir.

15      Q    Okay.  Were there any other communications from

16      Mr. Sizemore about you staying on administrative leave

17      or coming off of administrative leave?

18      A    Yes, sir.  It's in some of the other emails.

19      Q    Some of the others that we've talked about today?

20      A    Yes, sir.

21      Q    Okay.  Anything else other than that?

22      A    No, sir.  This one is the only one that really

23      says to stay on pending the investigation.

24      Q    Okay.  Other than the meeting that you just told

25      me about, did you have any other in-person meeting with
```

1       Mr. Sizemore?

2       A    No, sir.  The only other time I saw him in person

3       was when I came to get my belongings.  He opened the

4       backdoor and then told me to wait at where the ramp is

5       on the back of the property and that Keith would bring

6       me my stuff.

7       Q    Okay.  And at that meeting you said you were

8       talking about everything that was going on.  Does that

9       include HIPAA violations?

10      A    We did talk briefly about all of that and about

11      that I had told him -- I told him that -- that -- and

12      then I had told Mackenzie also because Mackenzie was in

13      there at that point -- that I had told Mackenzie that

14      was going to be -- that it was retaliatory.

15           And it was retaliatory because of all of the stuff

16      previous.  And I reminded Mackenzie that I had told her

17      when corporate HR was in there that -- that Star had

18      told me that she was going to find a way to terminate

19      me and everything.

20           So I did tell Greg about all of those things then

21      too.

22      Q    And when you say it was retaliatory for all the

23      things previous, that included raising the alert about

24      HIPAA violations and things that didn't involve

25      violations of law as well?

1    A    Yes.  And -- and the Medicare and -- well, the --

2    yeah, exactly what you said.  Yes, sir.

3    Q    Okay.  And so you mentioned Medicare, but there

4    were also things that weren't related to violations of

5    law?

6    A    Yes, sir.

7    Q    Okay.  All right.  Thank you.  And we're finished

8    with that document.

9         All right.  I'm passing you another document that

10   we'll mark as 9.  Can you tell me what that document

11   is?

12   A    Plaintiff's Response to Defendant's First Set of

13   Interrogatories to Plaintiff.

14   Q    Okay.  And did you help with the responses to

15   these?

16   A    Yes, sir.

17   Q    Okay.  Look at the very, very last page.

18   A    Yes, sir.

19   Q    I know this is notarized, but I wanted to ask

20   anyway.  Is that your signature on that page?

21   A    Yes.

22   Q    And all of the responses to the -- these

23   interrogatories are correct and truthful to the best of

24   your knowledge?

25   A    Best of my knowledge, yes.

```
 1      transfer.
 2           And I went into how I wished I could transfer and
 3      be on one of the other teams or something because
 4      treatments and everything else.  And he said he would
 5      see what he could do about that too.
 6      Q    Okay.  So it sounds like it was a positive
 7      meeting?
 8      A    (The witness nodded.)
 9           With him, yes.
10      Q    Okay.
11      A    If he had stayed longer, I -- I think something
12      positive could have happened.
13      Q    Okay.  And then you go on in your response to
14      indicate that you spoke -- you reported issues to State
15      of Tennessee and spoke with Special Investigator Nathan
16      Williams.  So you reported to the State of Tennessee.
17      Which agency did you report to?
18      A    I remember her name was Miss Nicole -- I was given
19      her name directly -- but Tennessee Department of Mental
20      Health and Substance Abuse.  And then Doug Tate with
21      TBI.
22      Q    Okay.  So you reported to them and then, I guess,
23      was referred to Nathan Williams?
24      A    Nathan Williams is who I talked to who was
25      doing -- supposedly doing the investigation into me.
```

156

1    Q    Oh.  So the HIPAA violations and -- and -- the

2    violations that we've been talking about didn't report

3    to Nathan Williams?

4    A    (The witness shook his head.)

5         Hum-um.

6              MR. BARNETT III:  Say "yes" or "no."

7    A    No, sir, I didn't.

8    Q    (By Mr. Ebelhar)  Okay.  Interesting.

9         So what was the person's name with the Tennessee

10   Department of Mental Health?

11   A    Her name was Miss Nicole.

12   Q    Nicole is her first name?

13   A    Yes.

14   Q    Can you recall her last name?

15   A    No, sir, not offhand.

16   Q    Okay.  Okay.  And so what specifically did you

17   tell her or report to her, I should say?

18   A    All these things I listed on -- starting on

19   page 13.

20   Q    Okay.  This is in response to interrogatory

21   number 18?

22   A    Yes, sir.

23   Q    Okay.  So these are all reported to her.

24        Okay.  And what, if anything, did the Tennessee

25   Department of Health and Substance have to do with --

```
 1      with your report?

 2      A     I would not be aware of that.

 3      Q     Okay.  Do you know if Perimeter ever learned that

 4      you made that report?

 5      A     They -- yes.  They knew I made -- I told them.

 6      Q     Who did you tell?

 7      A     I told Star, for one; I told Greg, for two;

 8      Mackenzie.

 9      Q     Okay.  When did you tell Star that you made the

10      report?

11      A     Shortly after I made it.

12      Q     When did you make the report?

13      A     End of January, very beginning of February.

14      Q     That's 2022?

15      A     Yes, sir.

16      Q     And you told her that you were -- specifically

17      told her you reported all the items in response to

18      interrogatory 18?

19      A     I don't know that I sat and listed everything, but

20      I told her that I had reported to the -- to the State

21      and TBI the things that I felt needed to be reported.

22      Q     You didn't give her any specifics?

23      A     (The witness shook his head.)

24            She didn't ask for specifics.  She just said, Do

25      what you feel you got to do.
```

```
1     Q    Okay.  And then what was the gentleman's name with
2     the TBI?
3     A    Doug Tate.
4     Q    And I'm assuming we're talking about the Tennessee
5     Bureau of Investigation.
6     A    Yes.
7     Q    Okay.
8                    MR. BARNETT IV:  That last name, what
9     letter does it begin with?
10                   THE WITNESS:  T.
11                   MR. BARNETT IV:  T?  Tate?
12                   THE WITNESS:  (The witness nodded.)
13                   Tate.
14    Q    (By Mr. Ebelhar)  Okay.  And when did you report
15    to the TBI?
16    A    I did both of them at the same time.
17    Q    So that and the Department of Mental Health and
18    Substance Abuse.
19         And did you report the same things to him?
20    A    Yes, sir.
21    Q    And I'm assuming you told Star about that as well?
22    A    Yes, sir.
23    Q    Okay.  You said you also told -- internally at
24    Perimeter you also told Mackenzie?
25    A    And -- and Greg.
```

1    Q    When did you tell Mackenzie?

2    A    The first time was in the meeting with HR that

3    happened in March or -- yeah, March.

4    Q    2022?

5    A    Yes, sir.

6         The second time was by email.

7    Q    And when was that?

8    A    I -- I believe it was later in March, when I was

9    put on leave.

10   Q    Okay.  And when you were telling Mackenzie in that

11   meeting with HR, that was in the context of saying you

12   thought you were being retaliated against?

13   A    Yes.

14   Q    Okay.  And then you said you told Greg Sizemore?

15   A    Yes.  I told him numerous times.

16   Q    When did you first tell him?

17   A    When I met him in person, and that was in April.

18   Q    This was after you'd received the separation

19   notice?

20   A    Yes.

21   Q    Okay.  And was it the same context where you said,

22   I feel like I'm being retaliated against for reporting

23   to the State?

24   A    That I'm being reported against.  Here's what I

25   feel -- this is why.  This is what I did.  This is what

1    I reported.  This is who I reported to.  This is what

2    happened shortly after I reported.  This is why.

3         And so after doing the report, this is the

4    consequences and sequential actions that happened

5    shortly thereafter.

6    Q    Okay.  And did you tell Mackenzie the particulars

7    of -- of what you reported to the State of Tennessee

8    for?  Or no?

9    A    I didn't tell her to -- like, I didn't itemize it

10   like this (indicating), but I told her who I reported

11   to and the generics of what I reported.  She didn't ask

12   for specifics either.

13   Q    Okay.  And what about with Greg?

14   A    I gave him the generics:  Who I reported to, when

15   I had.  He didn't seem like he cared.

16   Q    In either speaking with Mackenzie or -- or Greg,

17   did you mention that you were reporting HIPAA

18   violations?

19   A    Yes, sir.

20   Q    Okay.

21   A    And I think that's in numerous of the emails too.

22   Q    Is there anything else that you reported to the

23   State of Tennessee?

24   A    They did a follow-up email and requested times and

25   dates of the incidences, and so I gave times and dates

1           MR. BARNETT III:  Do you want to take a

2      break in a few minutes?

3           MR. EBELHAR:  Yeah.  Let me ask another

4      couple quick questions.

5      Q    (By Mr. Ebelhar)  Your Complaint alleges that you

6      reported violations of the Tennessee Medicaid False

7      Claims Act also.  Are -- is everything you listed also

8      a violation of that Act?

9      A    Yes, sir.

10     Q    Okay.  Is there anything other than what you've

11     listed that you reported that you would consider to be

12     a violation of the Tennessee Medicaid False Claims Act?

13     A    Not that I can think of offhand.

14     Q    Okay.  When you were reporting these things, were

15     you reporting this is a violation of the False Claims

16     Act, or this is a violation of the Tennessee

17     Medications Act, or were you just reporting Hey, we're

18     missing Health Needs Profiles; We aren't scheduling

19     these dental and vision appointments; We don't have

20     documentation for missed appointments?  Like, how did

21     you approach that?

22     A    I -- I tried both ways.

23     Q    All right.  So who did you tell that you were

24     violating -- the company was violating the False Claims

25     Act?

                                                            174

1      A      To Star, Taneshia, and the assistant DON.  I can't

2      remember her name right off.

3      Q      To Star, Taneshia --

4      A      And the assistant DON.

5                      MR. EBELHAR:  Okay.  Let's go ahead and

6      take that break.

7                      (There was a period off the record.)

8      Q      (By Mr. Ebelhar)  Okay.  What is your

9      understanding as far as what would constitute a

10     violation of the False Claims Act?

11     A      Anything that -- that somebody made a claim for

12     payment but then they did a service -- claim for a

13     service but then didn't do the service at that time.

14     Q      What do you mean by "claim for service"?

15     A      So if they say that they performed a task or a

16     service but didn't perform the task or service that

17     they claimed to have done, then they committed a fraud

18     at that time.

19     Q      Who did they perform a fraud on?

20     A      The client and the State.

21     Q      And is it because they asked -- they submitted

22     payment -- or, I mean -- sorry.  Is it because they

23     asked for payment for the service or just because --

24     just by virtue of telling them it happened at all?

25     A      It's when they submit a claim for payment for that

1    meeting about documentation, about the charts, about

2    everything being in the chart, about making sure -- and

3    they had just -- imagine this being the chart

4    (indicating).

5        They highlighted every single thing in there and

6    making sure that everything is in -- even had flags for

7    where the doctor was going to sign, had flags for where

8    therapists were supposed to sign, everything after all

9    that happened.  So it was -- it was a big ordeal.

10    We -- we -- they catered in lunch that day.

11        It was -- but they never told us what -- what

12    specifically had happened or why it was.  But it was

13    a -- we didn't -- we didn't even see clients or

14    anything that day.

15    Q    Okay.  And just to kind of, I think, tie a bow on

16    it, you reported to Star twice, talked to Taneshia

17    twice, the assistant director of nursing twice.  Did

18    you report to anybody else, report the violations to

19    anyone else?

20    A    No.  Just until I reported to State.

21    Q    Until you reported to State.

22        And let's see here.  That was in end of January,

23    beginning of February --

24    A    (The witness nodded.)

25        Um-hum.

                                                      192

1    Department of Children Services."  Why do you -- you

2    obviously think that she reported to Children Services

3    as a retaliatory act.

4    A    Yes, sir.

5    Q    You don't think that she was obligated to report

6    to DCS?

7    A    That was not her position to do it.  It was Risk

8    by policy.

9    Q    Didn't you say that, in practice, the supervisors

10   were telling Risk what to do?

11   A    By policy it was Risk's responsibility to do that,

12   not Star's.

13   Q    But it doesn't sound like that's the way

14   procedurally, at least locally, that's how that was

15   being handled.

16   A    But Star still wouldn't have made a report.  She

17   was supposed to make Stephanie do the report.

18   Q    Okay.

19   A    By policy and procedure, it's still supposed to be

20   Stephanie's responsibility.  If we went by what is

21   supposed to be done by ethics, by ethics every time we

22   see an abuse or anything else, then we make the report

23   ourselves.  But by policy, it's up to Risk to do the

24   investigation and Risk to make the report.

25   Q    So by policy, it's Risk's call on whether to

```
1       STATE OF TENNESSEE    )      C E R T I F I C A T E
                              )
2                             )
```

3          I, Jill A. Schaffer, Registered

4    Professional Reporter and Notary Public for the State

5    of Tennessee, hereby certify that the witness in the

6    foregoing deposition, **MR. DANIEL FAIN FOWLER**, was first

7    duly sworn by me, that the testimony of the witness was

8    written stenographically by me, and that such

9    deposition is a true and accurate record of the

10   testimony given by said witness on the 28th day of

11   February, 2024.

12          I further certify that I am neither

13   related to nor employed by any of the parties to this

14   cause of action or their counsel, nor am I financially

15   interested in the outcome of this matter.

16          I further certify that in order for this

17   document to be authentic it must bear my original

18   signature and embossed notarial seal, that reproduction

19   in whole or in part is not allowed or condoned, and

20   that such reproductions are deemed a forgery.

21          Witness my hand and seal at my office on

22   this the 15th day of March, 2024.

23

24   My Commission Expires:    Jill A. Schaffer, RPR, TN #375
        August 24, 2025        Notary Public at Large for the
25   My License Expires:       State of Tennessee
        June 30, 2024

                                                              240
```