```
                IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TENNESSEE
                          EASTERN DIVISION


DANIEL FAIN FOWLER,            )
                               )
        Plaintiff,             )
                               )
vs.                            )   Civil Action No.:
                               )   1:23-cv-01005-STA-jay
WOODRIDGE OF WEST TENNESSEE,   )
LLC d/b/a PERIMETER            )
BEHAVIORAL OF JACKSON,         )
                               )
        Defendant.             )
```

**THE VIDEOCONFERENCE DEPOSITION OF MR. GREGORY SIZEMORE**
February 29, 2024

**A P P E A R A N C E S**

| | |
|---|---|
| For the Plaintiff: | MR. JAY A. EBELHAR |
| | Jackson Lewis |
| | Suite 2803 |
| | 611 Commerce Street |
| | Nashville, Tennessee 37203 |
| For the Defendant: | MR. CHARLES H. BARNETT III |
| | MR. CHARLES H. BARNETT IV |
| | Spragins, Barnett & Cobb |
| | 312 East Lafayette |
| | Jackson, Tennessee 38301 |
| Also Present: | Mr. Daniel Fain Fowler |

SCHAFFER REPORTING SERVICE
JILL A. SCHAFFER, RPR
P.O. Box 3214
Jackson, Tennessee 38303
(731) 668-6880

```
 1                 The videoconference deposition of
 2    MR. GREGORY SIZEMORE was taken via Zoom at the instance
 3    of the Plaintiff, pursuant to notice, on the 29th day
 4    of February, 2024, beginning at approximately 5:03 p.m.
 5    and ending at approximately 7:13 p.m., for use pursuant
 6    to the Tennessee Rules of Civil Procedure before
 7    Jill A. Schaffer, Registered Professional Reporter,
 8    Licensed Court Reporter, and Notary Public for the
 9    State of Tennessee.
10         Counsel stipulated that all objections, except as
11    to the form of the questions, were reserved to on or
12    before the hearing and that all forms and formalities,
13    including the reading and signing of the completed
14    deposition by the witness, were expressly waived.
15
                              - - - - -
16

17                             **I N D E X**
18    Examination by Mr. Barnett III                    Page    3
      Examination by Mr. Ebelhar                                78
19    Further Examination by Mr. Barnett III                    94

20    Exhibit 1                                                 81
      Exhibit 2                                                 84
21    Exhibit 3                                                 86

22    Reporter's Certificate                                   100

23
                              - - - - -
24

25
```

1       first encounter I had with him.
2              It would have probably been around mid to late
3       March, and that was the first time I met him.
4       Q     Was that an in-person meeting?
5       A     It was an in-person meeting.
6              It was unscheduled.  He appeared in front of my
7       door.  And I -- I have a pretty vivid memory of that.
8       He was kind of being loud.  And the HR director was
9       probably in -- she was in an adjacent office, but I
10      would say 40, 50 feet away.
11             And he was raising his voice demanding who was
12      going to come and participate in a meeting in my
13      office.  And I informed Mr. Daniel I don't know exactly
14      who he is, but we don't work that way here.
15             If you want to meet with me, he can come in and
16      act like a gentleman, and we could have a conversation,
17      but he's not going to hold court in my office.  And so
18      he did come in and -- and have a conversation.
19      Q     Had he -- had he just received a termination
20      notice from you?
21      A     My recollection was that he had not received that
22      yet.  But the time -- you know, that's -- that's
23      several years ago.  I -- I -- I got to be honest with
24      you.
25             I knew that he was out on suspension; that's about

                                                            20

```
 1      all I knew.  I had never met the fellow.  So I -- I was
 2      wondering why somebody is in front of my office yelling
 3      instructions to me and my staff.  So that's why I asked
 4      him to have a seat and put his bag away and all that
 5      kind of stuff, so...
 6   Q  If it turns out that the facts are that you had
 7      sent a termination notice to him before that -- before
 8      that meeting, tell us why you did that.  Why did you
 9      fire him before that meeting?
10   A  So, again, my -- my recollection -- my
11      recollection was that that meeting is one of the
12      reasons that I -- I said I needed to look at his file
13      because I was alarmed by this gentleman's behavior
14      working with kids, number one.
15          And, number two, I knew -- know that we needed
16      a -- a therapist in the residential treatment center,
17      which is the job that he had at that facility.  There
18      were several levels of care at that facility.  And for
19      the RTC, we needed a therapist up there.  I believed
20      that he would be out on suspension for a while.
21   Q  Did he --
22   A  So he was going to be on suspension for quite a
23      while since the -- for the reason that he was out on
24      suspension.
25   Q  Mr. Sizemore, if -- if it turns out -- you know,
```

1    April 18th was the result of my concern over his first
2    meeting with me at the end of March and my looking into
3    the record because I had only been instructed and
4    informed that he'd been on suspension.
5         So that is the second meeting.  The meeting that
6    happened after April was the second meeting.
7    Q    (By Mr. Barnett III)  Were there two meetings?
8    A    (The witness nodded.)
9         There were two meetings.
10   Q    There were two meetings?
11        All right.  Tell me when -- why did you terminate
12   him?
13   A    I terminated him because we needed a therapist in
14   the RTC.  And in -- in -- I -- I would say to -- to
15   your -- your earlier question I was never during my
16   whole year there given any indication that the State of
17   Texas had authorized or released him from the ongoing
18   investigation of their child that was in our facility.
19        I also do not remember receiving during my -- I
20   don't remember receiving any clearance from the State
21   of Tennessee Department of Children Services or DHS
22   that he had been cleared of -- of the allegation that
23   resulted in his suspension and then his meeting with me
24   sometime in late March.
25   Q    Did you -- what did you learn about his

25

1    Q    Did -- how did you know what was or wasn't true
2    since you only arrived there in mid March at best?
3    Right?
4    A    That's correct.
5    Q    So how would you know what complaints he had made
6    and what whistles he had blown before then?
7    A    Right.  So I -- I'm not familiar with any of the
8    whistles that he's blown.  I -- I was referring to his
9    ranting about wanting position changes and demanding
10   reimbursements and just continual, you know -- I -- I
11   do recall him saying that he had created a Web platform
12   for utilization management over a -- over a period of a
13   weekend.
14        I just found him to be really out of touch,
15   noncredible, and -- and, quite honestly, concerning
16   is -- is my -- that was what I took from his initial
17   conversation.  As far as direct -- directly linked
18   allegations to anything specific, I don't remember him
19   giving me anything substantial.
20   Q    All right.  Well, take -- take me through your --
21   your best recollection of what you were told about
22   Mr. Fowler before you met him.
23   A    I was told that he was on suspension.  I got a --
24   I got an update from Mackenzie Rowan, who was a
25   somewhat newer HR director, and she gave me a list of

36

1      what was going on HR-wise.
2             And one of the things -- it wasn't at the top of
3      the list, but it was -- it was that we had a therapist
4      that was on leave, suspension pending the outcome of
5      investigation.  And it was centered around some
6      concerns with him making statements to a female Texas
7      resident.
8      Q    Okay.  All right.  Is that all the information you
9      had?
10     A    There -- that's it.  Yeah.  And that's why I was
11     very alarmed when he showed up to my door very loud and
12     demanding and ranting.
13     Q    Tell me about -- about that.  When did that take
14     place?
15     A    That was sometime in -- it was within my first
16     month, so it would have been sometime very late March
17     or -- or very early April.
18     Q    Okay.  And you --
19                  MR. BARNETT IV:  That's actually in
20     April.  The other prior -- and you can -- yeah.  And
21     other than -- and, actually --
22                  MR. EBELHAR:  I'm going to object to
23     this discussion as being improper.  We're here to
24     depose the witness based on his memory.
25                  MR. BARNETT III:  Sorry.

                                                              37

1      A     My door was open.

2      Q     Okay.  So he comes in your door.  So take us

3      through what happened.

4      A     Okay.  He's standing -- he's carrying a book bag,

5      and he looks to me a little disheveled at that time and

6      angry.  And then he -- I can remember him yelling, I

7      want Erika down here; I want -- I don't remember.  He

8      rattled off a couple of names.  I want them in Greg's

9      office.  We're going to meet now.

10           And I remember telling him, I said, I -- I don't

11     know who you are.  I don't know what you think is going

12     on here, but we're not going to do it this way.  And I

13     don't remember exactly what I said, but I said, You can

14     come in and have a seat and talk to me, or we can go

15     ahead and -- and have him just leave now.  And he did

16     come in and have a seat.

17     Q     Okay.  So --

18     A     And we talked through a few things, and then I had

19     Miss Mackenzie come in as a witness.

20     Q     All right.  Tell me what was -- what -- what he

21     said, what you said, what you contend he said.

22     A     It's been a while, but I can tell you mainly

23     Miss Mackenzie was a witness.  Mr. Fowler talked -- he

24     was very disorganized in his conversation.  He went

25     from one topic to another.

40

1          I -- I do remember him bringing up things about
2     his license and being -- let's see.  I don't remember
3     if he was divorced or separated, but there were
4     proceedings going on, that we were making his life hard
5     and that, you know, he was being done unjust, you know,
6     that he needed to be brought back from suspension and,
7     you know, that we were making a big mistake.
8          So that's -- those are kind of the general topics
9     I remember from that.  We -- we -- we did talk.
10    Temperatures calmed down, and we talked a little more.
11    And, you know, I -- I know what I would have said is,
12    The investigation has to take its course.
13         And -- and that's -- that's what I stand behind
14    that should have happened, that the investigation has
15    to take its course.  And you can't internally free
16    yourself from an abuse claim.  You have to have that
17    done externally.
18    Q    Did it take its course?
19    A    I don't know that Texas has cleared him to this
20    day.
21    Q    Do you know that Texas -- whether Texas ever
22    investigated?
23    A    Oh, they did, yes.  They did.  I had multiple
24    calls from Texas.  They wanted to make sure he was not
25    still working back at the facility.  They were still

1   A   I believe it occurred -- I believe it was in late
2   March.  It could have been early April, but I believe
3   it -- I believe it happened in late March.
4   Q   And you believe that that meeting occurred before
5   you served the termination notice.
6   A   That's correct.  And I -- I will state I don't
7   remember sending one out, so I assume that came from
8   Human Resources.
9   Q   Well, who would have made the decision to
10  terminate him?
11  A   To terminate?  If -- if I were CEO at the time, it
12  would have been me.  And I made the determination, so I
13  do believe that -- I believe my chronology is correct
14  of a late March meeting and an April 18th meeting.
15  Q   Okay.  You were -- you were taking us through the
16  meeting, and -- and you told me that he was -- he was
17  upset when he came to see you, knocked on the door.
18  Everybody calmed down.  You had a discussion with him
19  about it.
20      He asked for who to come in, and you wanted them
21  to come in -- so who was that lady?
22  A   Miss Mackenzie, the Human Resources director.
23  Q   Miss Mackenzie, the Human Resource lady?
24  A   Um-hum.
25  Q   And you all had discussion; is that correct?

```
 1     word "reasonable."  Is that correct?
 2   A    Yes.
 3   Q    Okay.  And so what were the circumstances of -- of
 4     this allegation that made it reasonable?
 5   A    Well, I'm not -- the -- the reasonable part was
 6     the girl made an allegation to his -- one of the staff,
 7     which contrary to this PHI policy, which is not the
 8     investigation policy -- this is a -- this is a policy
 9     about protecting and what can be disclosed once an
10     allegation of abuse is done, not actually conducting an
11     investigation.
12   Q    So there is another policy?
13   A    I would hope so.  I can't speak definitively, but
14     this is about PHI; this is not about conducting an
15     investigation.
16   Q    Well, okay.  But, number one does -- does have to
17     be -- before anything, it has to be a reasonable
18     belief.  Correct?
19   A    That policy and procedure is trumped by state law,
20     and that is any allegation of abuse has to be reported.
21     And it should have been reported, and I stand by that.
22   Q    Okay.  So is it -- is -- is it your understanding
23     that any time anybody says anything --
24   A    No.  If -- if it's about abuse towards a patient,
25     whether sexual or physical, the -- the employee should
```

1    be -- I would have suspended the employee, and I would
2    have made a report.  That -- and so that's contrary to
3    that because state law --
4    Q    Whether it's --
5    A    -- trumps that.
6    Q    Whether it's reasonable or not, any -- any time an
7    allegation whatsoever, however unfounded it may be, you
8    report it to the DHS and suspend the employee?
9    A    (The witness nodded.)
10        If it's about abuse towards a patient, yes.
11   Q    You didn't answer the -- that's been the policy,
12   that if anybody said anything you suspend -- suspend
13   the person for -- indefinitely.
14   A    Until the -- until the report is done and the
15   investigation is done, right.  Yeah, if it's about
16   abuse.
17   Q    And what -- what is "abuse"?
18   A    Well, I think that would, hopefully, be gathered
19   in -- in more comment somewhere in a different policy
20   other than PHI policy, but I think in this indication,
21   it was sexual in nature, asking someone to expose
22   themselves.  So that would have been an allegation of
23   sexual abuse.
24        Physical abuse would have been putting -- putting
25   your hand on a kid without any appropriate reason for

```
 1      A     No, because he -- he was -- the action plan was
 2      that he was suspended.  If we would have brought him
 3      back, there -- there would have definitely been an
 4      action plan for safety, the contract for safety for the
 5      situation.  But because he was on suspension, that
 6      was -- that was good enough at that point.
 7      Q     Okay.  After that meeting, you did -- you -- I was
 8      asking you after that meeting, what did you do?  And
 9      you told me that you talked to HR.
10      A     (The witness nodded.)
11      Q     Right?
12      A     Right.
13      Q     And -- and that was who in HR?  My memory is so
14      poor.
15      A     It's okay.  Mackenzie Rowan is the -- the HR
16      director that was there when I -- that I worked with.
17      Q     Okay.  Is she still there?
18      A     I believe she is.  My -- my last understanding is
19      that she's still there.
20      Q     And what did she tell you?
21      A     So we looked at the -- I -- I wanted to look at
22      his file.  I think I saw a few disciplinary action
23      forms.  One thing that struck out to me -- I always try
24      to look at the application -- is that he had an open
25      harassment charge that he failed to report, which
```

60

1       concerned me, especially based on my previous
2       interaction with him earlier that day.
3              So I asked her, Why in the world do we have
4       somebody with an open harassment charge working at our
5       facility?  And she couldn't answer that question.  I --
6       I think the answer she gave was she wasn't the HR
7       director at the time of his employment.
8       Q    But did you determine that there wasn't an open
9       charge, that that was a spurious charge that had been
10      dismissed?
11      A    It was open at the time I -- that I reviewed it.
12      Q    Did you -- did you check with the court?
13      A    (The witness nodded.)
14           I checked online.
15      Q    Did you?
16      A    Yeah, I did.
17      Q    Tell me -- tell us the procedure you used to check
18      online.
19      A    We look on the -- the court docket.  So I didn't
20      look at the official record, so I -- I will clarify
21      that statement.
22      Q    So you didn't check it.
23      A    I -- I didn't check it on an official document,
24      yeah.  It was --
25      Q    Did you check it on an unofficial document?

61

```
1    A    It was online.  Yes, sir.
2    Q    What --
3    A    It showed up in --
4    Q    -- online?
5    A    I'm sorry.  Go ahead.
6    Q    What online?
7    A    So we had an online backup check that we used, a
8         third-party vendor -- I cannot tell you the name of
9         it -- that they pull background checks.
10   Q    So you had -- you really had no idea whether it
11        was pending or not.
12   A    Well, it -- it -- it wasn't listed that he had
13        been charged with it, so either way in my eyes he's
14        lying.
15   Q    So you determined that this guy was lying when the
16        truth of the matter was that he wasn't.
17   A    I don't believe that's true.  I think he had been
18        charged.
19   Q    But you -- you don't believe that's true.  You
20        don't believe that this -- that this matter arose from
21        a divorce, and his wife made this silly charge.  It was
22        dismissed by the Judge, and he brought in evidence of
23        that, and that's why he was hired.  You're just going
24        to tell us that he's a liar.  Right?
25   A    There was no evidence in his file, so I don't --
```

62

1    Q    You're not -- you're not telling that -- that
2    you're not the person that's -- correct?  Does that
3    make -- well, okay.  What else did you do?
4    A    I believe that -- I don't have the application,
5    but I believe it's -- you know, you're supposed to list
6    when you're charged.  And if he did report that, I
7    could be wrong, so I apologize for that.  But I -- I
8    didn't see any evidence of him clarifying the
9    harassment charge.
10   Q    So now you're -- you're telling us that it wasn't
11   him that -- that told the -- about this -- this charge
12   when he was -- when he applied.  Is that correct?
13   A    I wasn't there when he was -- applied.  I know it
14   was not in the documents that I saw.  I saw an open
15   harassment charge based on our third-party vendor that
16   does background checks.
17        I didn't see it listed.  There's a place where you
18   mark if you've ever been charged.  And if it was
19   erroneous and silly from his wife, I apologize.  But he
20   didn't mark that he had been charged, and he had been
21   charged.  He may have gotten it cleared up, but he had
22   been charged.  And I do think he lied.
23   Q    Okay. So then after you -- you -- after you
24   checked with some online vendor and -- and talked to
25   the HR lady, then what did you do?

63

1    Q    Okay.  And I believe you testified that -- that
2    Star Armstrong wasn't -- there wasn't much -- actually,
3    I think you said there was no consultation with -- with
4    Star Armstrong.  Is that right?
5    A    I don't remember any conver -- any conversations
6    with her.  We were not really -- I don't think I was
7    welcomed by Ms. Armstrong to some degree because I took
8    the CEO role that I think she wanted.
9         There was no animosity or -- or she wasn't
10   aggressive towards me, but I would not have consulted
11   with her.
12   Q    If -- if you had consulted with her and she had
13   made negative statements about -- about Mr. Fowler,
14   would that have -- strike that.
15        Is there anything that she could have said to you
16   that would have altered your decision to go ahead and
17   proceed with termination?
18   A    No.
19   Q    Were you aware or did anyone -- let me -- let me
20   ask this a different way.  Did anyone make you aware,
21   whether it was Mr. Fowler or anybody else, that
22   Mr. Fowler had reported violations of law by Perimeter
23   to any state agency of the state of Tennessee?
24   A    I don't have any -- no, hum-um.
25   Q    Okay.  I -- I'm going to quickly show you a few

80

1      matter who investigates it that you're going to
2      determine that this man is guilty?
3      A     This -- this single suspension and investigation
4      is not what the -- what I hold -- held my hat to.  It
5      was the nature of my conversations with him; it was the
6      fact that there was an allegation that didn't get
7      cleared until June; that I had had conversations of
8      steep concern from people from this state of Tennessee
9      and from Texas; and the way he behaved in my office.
10            He lied on his application, and he misrepresented
11     many things in the conversation that I feel I had with
12     him.  I -- I feel like I stand by the decision to
13     terminate.
14     Q     Well, what -- what about that he was trying to
15     take the initiative to develop a software program to
16     help children?
17     A     It's -- it's outlandish.  Quite honestly, it's
18     bizarre and outlandish and it's not true.  It's --
19     it's -- it's -- I -- I have a friend in Fort Lauderdale
20     developing one, and he's got an MBA in engineering and
21     has worked on it for years.  I think it speaks to the
22     general nature of his willingness to -- well, nonsense.
23     Q     Sort of like as outrageous of Hedy Lamarr
24     inventing a system for frequency hopping during World
25     War II?

```
1                              )
     STATE OF TENNESSEE         )    C E R T I F I C A T E
2                              )
```

3        I, Jill A. Schaffer, Registered

4   Professional Reporter and Notary Public for the State

5   of Tennessee, hereby certify that the witness in the

6   foregoing deposition, **MR. GREGORY SIZEMORE**, was first

7   duly sworn by me, that the testimony of the witness was

8   written stenographically by me, and that such

9   deposition is a true and accurate record of the

10  testimony given by said witness on the 29th day of

11  February, 2024.

12       I further certify that I am neither

13  related to nor employed by any of the parties to this

14  cause of action or their counsel, nor am I financially

15  interested in the outcome of this matter.

16       I further certify that in order for this

17  document to be authentic it must bear my original

18  signature and embossed notarial seal, that reproduction

19  in whole or in part is not allowed or condoned, and

20  that such reproductions are deemed a forgery.

21       Witness my hand and seal at my office on

22  this the 17th day of March, 2024.

23

24  My Commission Expires:      Jill A. Schaffer, RPR, TN #375
        August 24, 2025         Notary Public at Large for the
25  My License Expires:         State of Tennessee
        June 30, 2024
                                COPY

                                                            100